**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 28, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff - Appellant,

v.

CHASE JOSEPH DELL,

      Defendant - Appellee.

No. 11-4078
(D.C. No. 2:10-CR-00896-TC-1)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **HARTZ, HOLLOWAY,** and **HOLMES,** Circuit Judges.[**]

Late in the afternoon on August 28, 2010, Defendant-Appellee Chase Joseph Dell

and a female companion were peering into the windows of a legally parked automobile.

The car was parked on a street in the Glendale neighborhood of Salt Lake City, which is

thought by some to be a high-crime neighborhood. A police officer was patrolling the

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[**] After examining the parties' briefs and the appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2) and 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

neighborhood in his squad car, and observed Mr. Dell and his female companion looking into the parked car. Mr. Dell looked toward the patrolling officer, and immediately thereafter he and his companion walked away from the parked car, though the companion equivocated before following Mr. Dell's lead. The officer, based on these observations, desired further investigation of Mr. Dell and his companion. So he signaled Mr. Dell over to his car in order to ask some questions. From that point on, Mr. Dell's behavior became more and more suspicious, and ultimately the officer found a gun in Mr. Dell's possession. As a result, Mr. Dell, who is a convicted felon, was charged with illegally possessing a firearm in violation of 18 U.S.C. § 922(g)(1).

Mr. Dell moved the district court to suppress evidence seized from his person and statements made during the detention, arguing that the officer illegally detained him by ordering him to approach the police car. After an evidentiary hearing, the district court granted Mr. Dell's suppression motion. The United States brings this interlocutory appeal from that decision. We **AFFIRM**, concluding the district court correctly ruled that the officer lacked the requisite reasonable suspicion to initiate an investigative detention of Mr. Dell.

I

"When reviewing the grant of a motion to suppress, this Court examines the evidence in the light most favorable to the defendant and accepts the district court's factual findings unless they are clearly erroneous." *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). "The ultimate determination as to whether an officer's

2

conduct violates the Fourth Amendment, however, is reviewed de novo." *Id.* Because we owe deference to the district court's factual findings, and because neither party challenges any of those findings as clearly erroneous, our recitation of the facts draws extensively from the district court's order, *United States v. Dell*, No. 2:10-CR-896-TC, 2011 WL 939383 (D. Utah Mar. 16, 2011) (hereinafter "Order").

At around 5:00 p.m. on August 28, 2010, Officer Moe Tafisi of the Salt Lake City Police Department was on patrol in the Glendale neighborhood of Salt Lake City, an area which he had patrolled for the entirety of his six and a half years with the department. Order at *1. Officer Tafisi testified that he believes the Glendale area has a high rate of certain types of crime, specifically car break-ins and drug offenses. *Id.* Neither he nor the government, however, offered any statistical data or other evidence to support this observation. *Id.*

Officer Tafisi drove his patrol car southbound on Navajo Street, and when he neared the intersection with 550 South, he saw a man (later identified as Mr. Dell) and woman peering into the windows of a car which was legally parked on the street. *Id.*; R. at 84. Mr. Dell was on the driver side and the woman on the passenger side, and each was hunched over, looking back and forth inside the car. Order at *1. Before Officer Tafisi's patrol car reached the parked car, Mr. Dell looked in his direction and thereafter walked away from the parked car. *Id.* The woman initially followed Mr. Dell, but returned to the parked car momentarily before finally following a few steps behind him.

3

*Id.* Officer Tafisi never saw either individual touch the car in any way, nor did he see them possessing any tools or objects. *Id.*

The individuals walked in the same direction Officer Tafisi was travelling. *Id.* Desiring further investigation, Officer Tafisi drove past them, made a U-turn at the next intersection, and then parked his car in the street. *Id.* From inside the parked patrol car, he waved Mr. Dell over to his patrol car, and simultaneously called out, "Hey, come over."[1] *Id.* Mr. Dell promptly complied with the instruction, and approached Officer Tafisi's patrol car. *Id.*

At this point, we have set forth all the operative facts — the government concedes that by the time Officer Tafisi said, "Hey, come over," a Fourth Amendment seizure began. We do not recite in detail what happened after the initial interaction, because the district court made no determinations as to the continuing validity of the investigative detention. For our purposes, it suffices to acknowledge that after Mr. Dell walked up to the patrol car, Officer Tafisi became more and more suspicious for a variety of reasons, and after a period of time — perhaps half an hour, though the precise length of time is not

---

[1] Officer Tafisi initially testified that he said, "Come over," but on cross-examination testified that he said, "Hey, come over." In its recitation of facts, the district court did not explicitly recognize this discrepancy, and only acknowledged the "Hey, come over" statement. Because the government concedes that the encounter between Officer Tafisi and Mr. Dell was a nonconsensual one, we adopt the district court's view of the testimony without inquiring further into the discrepancy, which is not material to resolution of the ultimate issue — the reasonableness of Officer Tafisi's justification for seizing Mr. Dell.

4

clear from the record — identified Mr. Dell as a convicted felon and found a gun on his person.

II

The government brought a one-count indictment charging Mr. Dell, who is a convicted felon, with a violation of 18 U.S.C. § 922(g)(1), which prohibits felons from possessing firearms. Mr. Dell moved to suppress all evidence seized during his encounter with Officer Tafisi, including the gun he was allegedly carrying illegally.

Police-citizen encounters are divided into three categories: (1) consensual encounters which do not implicate the Fourth Amendment; (2) under *Terry v. Ohio*, 392 U.S. 1 (1968), investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests which are reasonable only if supported by probable cause. *United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006). In the district court, the government argued that Officer Tafisi's initial interaction with Mr. Dell was a consensual encounter *and* that, in any event, Officer Tafisi had reasonable suspicion to conduct an investigative detention of Mr. Dell.

The district court concluded that Officer Tafisi initiated an investigative detention of Mr. Dell rather than a consensual encounter. Order at *3. In considering whether the detention was reasonable under the Fourth Amendment, the court noted that Mr. Dell's behavior of standing by a parked car and looking into the windows back and forth was no different from that of other pedestrians in the neighborhood. *Id.* at *5 (citing *Brown v.*

5

*Texas*, 443 U.S. 47, 52 (1979); *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).  The court

also held that the description of Glendale as a high-crime area was insufficient to give

Officer Tafisi reasonable suspicion.  *Id.* (citing *Brown*, 443 U.S. at 52).  Also insufficient

in the district court's view was the fact that Mr. Dell and his companion walked away

from the parked vehicle once Mr. Dell saw Officer Tafisi approaching.  *Id.* (citing *United

States v. Davis*, 94 F.3d 1465, 1469 (10th Cir. 1996)).  The district court also analyzed

the totality of the circumstances, concluding that all the facts, taken together, did not

amount to reasonable suspicion that Mr. Dell was engaged in criminal activity.  *Id.*

As a result, the district court granted Mr. Dell's suppression motion.  *Id.* at *6.

The government filed this interlocutory appeal from that decision.  We have jurisdiction

to hear this interlocutory appeal pursuant to 18 U.S.C. § 3731.[2]

---

[2] The government has complied with § 3731's substantive certification
requirements — *i.e.*, it has certified that the appeal is not taken for the purpose of delay
and that the suppressed evidence constitutes substantial proof of a fact material to the
proceeding.  Mr. Dell does not challenge the merits of the certification, nor do we see any
reason to disagree with the government's duly certified contentions.

Another potential problem lurks, though: The government did not file its notice of
appeal within thirty days as required by § 3731.  However, the district court granted an
extension of the thirty-day statutory deadline for "good cause" pursuant to Fed. R. App.
P. 4(b)(4).  *See* Doc. 34.  According to our precedent, § 3731's thirty-day deadline —
which is jurisdictional in nature — *can* be extended pursuant to Rule 4(b)(4).  *In re
Grand Jury Proceedings*, 616 F.3d 1186, 1199 (10th Cir. 2010) ("Rule 4(b)(4) can extend
the jurisdictional time limit imposed by 18 U.S.C. § 3731.").  Because the government
filed its notice of appeal within the validly extended time limit, we have jurisdiction to
hear this interlocutory appeal.

On appeal, the government has deliberately abandoned its argument that this was a consensual encounter. Aplt. Reply Br. at 2 n.1 ("Although an argument could be made that the initial encounter was consensual, the United States has elected not to pursue this theory on appeal."). Thus, we only inquire whether Officer Tafisi had reasonable suspicion of criminal activity when he seized Mr. Dell. If he did not, the government concedes, the seizure was illegal, and fruits of the seizure — including evidence of Mr. Dell's gun possession — must be suppressed.

III

The dispute in this case is straightforward: Did the facts known to Officer Tafisi before he called Mr. Dell over to his car add up to a reasonable suspicion that criminal activity (specifically, a car break-in) had occurred, was occurring, or was about to occur? "In making this determination, we look at the totality of the circumstances to determine whether a particularized and objective basis, viewed from the standpoint of an objectively reasonable police officer, existed for suspecting legal wrongdoing." *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officer Tafisi made three observations which at least arguably play into the reasonable suspicion analysis: (1) Mr. Dell and his companion were in what the officer thought to be a high-crime neighborhood, particularly with regard to car break-ins and drug crimes; (2) Mr. Dell and his companion were peering into the windows of a legally parked car; and (3) Mr. Dell and his companion walked away from the parked car upon seeing that the patrolling officer was headed in their direction.

7

The Glendale neighborhood's supposed high-crime status was given little weight by the district court. Officer Tafisi's assertions about crime levels in Glendale were generalized and ambiguous, and he did not specify any portion of the Glendale area which had elevated crime rates. He said that Glendale had high crime rates for car break-ins, drugs, and other unspecified types of crime. *See* R. at 66. And, as the district court pointed out, no statistics or testimony backed up this claim other than Officer Tafisi's comment that he had six and a half years' experience patrolling the Glendale area.

In accordance with the proper standard of review, we must view the facts in the light most favorable to the defendant, and also refrain from denigrating the trial judge's factual findings, which were made after the trial judge personally witnessed Officer Tafisi's testimony at the suppression hearing.[3] The district court found that Officer

---

[3] Our dissenting colleague asserts that "Officer Tafisi's observations of the neighborhood he has patrolled for six-and-one-half years are inherently reliable," and thus constitute "exactly the type of evidence we would want to determine the characteristics of a neighborhood." Dissenting op. at 15 (emphasis omitted). Relying on these supposed indicia of reliability, the dissent gives substantial weight to Officer Tafisi's testimony. *Id* at 15-17.

Our standard of review forbids us from engaging in this type of appellate fact-finding, and instead requires us to defer to the facts as found by the district court. The dissent does not disagree with our statement of the proper standard of review. *See* dissenting op. at 4.

The dissent's approach is troubling. Specifically, the dissent fails to defer to the district court's factual finding that Officer Tafisi's observations were *not* particularly reliable or probative. *See* Order at *1, *5. We decline to join the dissent in overriding the district judge's thoroughly stated factual findings, which were based on her observations of live testimony in open court. *See* Order at *1, *5 (giving little weight to

(continued. . .)

Tafisi's beliefs about the area's crime rate were anecdotal in nature, and not particularly probative or persuasive. Order at *1, *5. Deferring to that finding, we decline to attribute significant weight to the fact that this incident took place in a supposed "high crime" area.

Similarly, Mr. Dell's walking away upon seeing a police officer tells us very little about the likelihood of criminal activity taking place. To be sure, a defendant's *flight* upon seeing the police can be quite probative. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). But *walking* away on the sidewalk in the same direction that a police officer is travelling does not speak to anything criminal at all. Indeed, while the Supreme Court has told us that "evasive" behavior can suggest criminal activity, the

_____

(continued . . .)

Officer Tafisi's testimony about Glendale's supposed "high crime" status in light of the absence of meaningful supporting evidence).

The basis for the district court's finding — personally witnessing Officer Tafisi's testimony — contrasts with the basis for the dissent's interpretation of the facts, which is simply a reading of the cold record. Because we lack the benefit of having observed Officer Tafisi's testimony in person, we must give deference to the district court's characterization of it, and thus we decline to substitute our own views about the testimony for those of the trial judge.

Court has characterized such behavior as an "obvious attempt[] to evade officers" or hide. *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975).

Walking down a public sidewalk, in the same direction as and in plain view of a patrolling officer such that the officer *passes* the walking suspect before reaching a nearby intersection, is nothing like the evasive behavior which has proved meaningful to the Court. *Cf. Florida v. Rodriguez*, 469 U.S. 1, 3-4, 6 (1984) (per curiam) (recognizing that an officer's suspicion was further aroused where a suspect "attempted to move away" by pumping his legs "up and down very fast" after being told by his cohorts to "[g]et out of here"); *United States v. Sokolow*, 490 U.S. 1, 8-9 (1989) (acknowledging that taking an "evasive" path through an airport to avoid detection might arouse suspicion). In fact, here, walking away is arguably the *least* suspicious activity that Mr. Dell could have engaged in. After all, as we have just stated, running away certainly would have been suspicious. And staying put, continuing to linger around the car that the officer thought was the target of a break-in, would have added to the officer's suspicion.[4]

---

[4] The dissent's analysis relies heavily on the behavior of Mr. Dell's companion, arguing that it represented "furtive conduct" indicative of criminal activity. Dissenting op. at 21. We respectfully disagree. The companion's conduct was, in our view, even more exculpatory in nature than Mr. Dell's own conduct, which was itself innocuous.

After all, if either Mr. Dell or his companion was involved in criminal activity, why would the companion be eager to return to the supposed scene of the crime while in the immediate vicinity of a uniformed police officer? Thus, although we do not quarrel with the dissent's citation of authority establishing that furtive movements may add to an officer's suspicion, we decline to join the dissent in characterizing the companion's reaction to the officer's presence as "furtive conduct."

10

Although we consider the totality of circumstances in evaluating the degree of suspicion a reasonable officer would have held, this particular behavior contributes little, if anything at all, to the suspiciousness of the situation.

Recognizing that the foregoing factors contribute little to the reasonable suspicion analysis, we must carefully consider Mr. Dell's behavior of peering into the car window in tandem with his female companion. As to what exactly was observed, Officer Tafisi testified on direct examination:

> I saw a male and a female. The male was standing on the driver's side of the car and it was parked along side of the road . . . . [I]t appear[ed] to me that they were looking inside the car. . . . They were looking back and forth, and [they were] doing the same actions as [each] other . . . . It did not appear as if they were entering or exiting. It appeared that they were just standing there looking.

R. at 68-69 (punctuation edited). Officer Tafisi acknowledged that he never saw either Mr. Dell or his companion touch the parked car. R. at 87. He also said that the suspects were standing "within a few inches" of the parked car, and that they were standing somewhat tilted or hunched over as they looked into the car's windows. R. at 99-100.

This behavior, when considered in conjunction with the other circumstances, is not enough to give rise to the level of suspicion required to justify Mr. Dell's detention. Particularly troubling, though certainly not fatal on its own, is the absence of any illegal conduct by Mr. Dell (or his companion). All that Officer Tafisi observed was lawful conduct which, we are left to assume, he thought might be associated with other actions (either in the past or future) that might be illegal. The conduct observed by Officer Tafisi was so innocuous and so very much in the realm of ordinary behavior that it would not

11

lead a reasonable officer to suspect that a car break-in had occurred or was about to occur.

The government's argument that Mr. Dell's behavior was "inherently suspicious" is conclusory, and skips the crucial part of reasonable suspicion analysis by failing to ask — or answer — *why* the officer's observations indicated suspicious criminal behavior. Addressing the purpose of "prevention of crime," Chief Justice Burger has stated for a unanimous Court, "even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it." *Brown v. Texas*, 443 U.S. 47, 52 (1979).

To be sure, common sense tells us that if a break-in was happening, the observed conduct would almost necessarily be a part of that sequence of events. However, common sense *also* tells us that an array of lawful activities would also include the observed behavior. Peering into a car, we assume, typically occurs when a break-in happens; but it *also* occurs at many other times when *nothing* illegal is happening. Underscoring this point, Officer Tafisi only observed Mr. Dell and his companion having a momentary, fleeting interest in the vehicle — Mr. Dell and his companion had walked away from the car almost immediately after Officer Tafisi observed them peering into it. Perhaps a prolonged observation of Mr. Dell would have revealed behavior more closely associated with criminal activity. But what Officer Tafisi actually saw was too tame to suggest reasonable suspicion.

12

Although we are compelled to "grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances," *United States v. Lopez*, 518 F.3d 790, 797 (10th Cir. 2008) (quotations omitted), there is little to defer to where the investigating officer demonstrates no connection between his training and experience and the suspicion of illegality. Officer Tafisi never articulated why his observations led him to suspect criminal activity — he did not discuss any prior experiences or training which supported his stated belief that a suspect peering into a car is likely involved in a car break-in.

Under *Terry v. Ohio*, an officer conducting an investigative detention must reasonably suspect that "criminal activity may be afoot." *Terry*, 392 U.S. 1, 30 (1968). If the officer wishes to conduct a frisk, the officer must reasonably suspect "that the persons with whom he is dealing may be armed and presently dangerous." *Id.* In this case, only the first standard is in play, because a protective frisk was not part of the initial investigatory detention. In applying *Terry's* reasonable suspicion standard, we view "the totality of the circumstances to see whether the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing." *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (en banc) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). And although *Terry* in some circumstances allows the police to briefly detain individuals without probable cause for an arrest, "*any* curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the

13

person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980) (emphasis added).

As the Ninth Circuit concluded: "A hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion." *United States v. Thomas*, 211 F.3d 1186, 1192 (9th Cir. 2000). Officer Tafisi had what amounted to no more than a hunch based upon a momentary observation. Accordingly, his detention of Mr. Dell was an unreasonable Fourth Amendment seizure, and we **AFFIRM**.

ENTERED FOR THE COURT

William J. Holloway, Jr.
Circuit Judge

14

**11-4078,** *United States v. Dell*

**HOLMES**, Circuit Judge, dissenting.

The majority concludes that the district court was correct in granting Mr. Dell's

suppression motion. The majority reasons that Officer Tafisi "lacked the requisite

reasonable suspicion" to stop Mr. Dell because Officer Tafisi acted on nothing more than

"a hunch based upon a momentary observation." Maj. Op. at 2, 14. I respectfully

disagree. Because I believe that Officer Tafisi's suspicion that Mr. Dell was engaged in

criminal conduct was reasonable and *based on facts*—not a hunch—I would reverse the

district court's suppression order and remand the case for further proceedings.

## I

At around 5:00 p.m. in late August of 2010, Moe Tafisi, an officer of the Salt Lake

City Police Department was patrolling the Glendale area of Salt Lake City, Utah, in his

marked patrol vehicle. Officer Tafisi had spent his entire six-and-one-half-years with the

Salt Lake City Police Department patrolling that area. In his experience, Officer Tafisi

believed Glendale to be an area for "high[] crime." Aplt. App. at 66 (Mot. to Suppress

Hr'g Tr., dated Dec. 13, 2010) (Tafisi Test.). More specifically, it was a high-crime area

for "a lot" of car break-ins (i.e., "car prowl[s]") and "drugs and so forth"—which he had

personally been involved in investigating. *Id.* at 66, 100–01.

Officer Tafisi was driving south on Navajo Street when approximately fifteen

yards away he saw Mr. Dell and a female companion[1] standing next to a parked, empty

---

[1]      The record does not identify Mr. Dell's companion by name.

car located on the west side of the street. Mr. Dell was standing on the driver's side, and his companion was on the passenger's side of the car. Both were leaning toward the car, a few inches away from each window, and peering into the car in a back-and-forth manner. From Officer Tafisi's perspective, it did not appear as if the two were entering or exiting the vehicle; instead, it appeared as if "they were just standing there looking." *Id.* at 69. Although Officer Tafisi admitted that Mr. Dell and his companion could have "happened to pass the vehicle," he testified that it "did not appear that way," *id.* at 99, and their behavior was "[not] consistent" with someone just walking by, *id.* at 102.

Officer Tafisi considered these actions by Mr. Dell and his companion to be "indicative [of] what [] car prowl[ers] would do." *Id.* at 87. Yet, what happened next further troubled him. As Officer Tafisi drove toward the pair, Mr. Dell looked towards Officer Tafisi's direction. After seeing Officer Tafisi, Mr. Dell immediately turned south and walked away from Officer Tafisi's patrol car—in the same direction that Officer Tafisi was driving. The companion, on the other hand, did not move in lockstep with Mr. Dell. Instead she "paused a little bit"—for a few seconds—before she decided to follow Mr. Dell. *Id.* at 69.

Officer Tafisi did not yet attempt to make contact with Mr. Dell and his companion. Instead, he decided to pass the pair to see whether the car belonged to them or if they were going to go back to the car. As Officer Tafisi passed by, he could see Mr. Dell and the companion in his rearview mirror. While Mr. Dell continued to walk south, his companion *again did not act in concert with him*; instead, she "backtrack[ed]" toward

the car, then a "few seconds" later turned back around to follow Mr. Dell. *Id.* at 70.

Having found all of these actions "suspicio[us]" and also "indicative" of car prowling,

Office Tafisi finally decided to make contact. *Id.* at 70, 87.

Officer Tafisi made a u-turn and parked in the middle of the street. He then

motioned to Mr. Dell with his hand, and said, "Hey, come over." *Id.* at 85 (internal

quotation marks omitted). Standing on the sidewalk, Mr. Dell complied and approached

Officer Tafisi's patrol car in the street.[2] During the ensuing encounter, Officer Tafisi

became increasingly suspicious of Mr. Dell. Officer Tafisi consensually searched Mr.

Dell and found a gun in his front pocket.

Mr. Dell was charged in a one-count indictment with felon in possession of a

firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He subsequently filed a

motion to suppress the evidence found and statements that he made during the encounter

as fruit of an unlawful stop. The government opposed the motion, arguing that the

encounter was both consensual and supported by reasonable suspicion.

After an evidentiary hearing, the district court granted Mr. Dell's motion, finding

that the encounter amounted to a seizure that was not supported by reasonable suspicion.

The district court first concluded that Officer Tafisi's initial encounter with Mr. Dell "was

an investigatory stop because a reasonable person, under the totality of the circumstances,

---

[2]     Consistent with the government's concession, *see* Aplt. Reply Br. at 2 n.1 ("The United States has elected not to pursue [a consensual encounter] theory on appeal."), when Officer Tafisi said, "Hey, come over," and Mr. Dell complied, I assume without deciding that, at that moment, a Fourth Amendment seizure began.

would not have felt at liberty to ignore Officer Tafisi." Aplt. App at 54 (Dist. Ct. Order & Mem. Decision, filed Mar. 16, 2011). Because the district court held that the initial encounter was an investigative stop, it next analyzed everything leading up to the encounter to determine whether Officer Tafisi had reasonable suspicion to make that stop. Based upon an analysis of the totality of the circumstances, as required by *Terry v. Ohio*, 392 U.S. 1, 21 (1968), the district court held that Officer Tafisi did not have "a reasonable, articulable suspicion that Mr. Dell was engaged in criminal activity." Aplt. App. at 55. The district court concluded that three key facts present in this case, considered together, were insufficient to create reasonable suspicion: (1) Officer Tafisi believing he was in a high-crime area; (2) Officer Tafisi observing Mr. Dell and his companion standing on either side of a car peering inside; and (3) Mr. Dell and his companion walking away upon seeing Officer Tafisi. Consequently, the court granted Mr. Dell's motion to suppress. Thereafter, the government filed a timely notice of appeal.

## II

In reviewing the district court's decision to grant Mr. Dell's motion to suppress, our precedent dictates that we view the facts in the light most favorable to the prevailing party—Mr. Dell. *See, e.g.*, *United States v. Salazar*, 609 F.3d 1059, 1061 (10th Cir. 2010); *United States v. Jones*, 523 F.3d 1235, 1237 (10th Cir. 2008). And we "accept[] the factual findings of the district court unless they are clearly erroneous." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007). However, "the ultimate determination of reasonable suspicion . . . is a mixed question of law and fact that we review de novo."

-4-

*United States v. Hauk*, 412 F.3d 1179, 1185 (10th Cir. 2005); *see United States v. Chavira*, 467 F.3d 1286, 1290 (10th Cir. 2006) ("[W]e review de novo the ultimate determination of reasonableness under the Fourth Amendment because that is a legal conclusion.").

The majority is correct that this case turns on one straightforward issue: Did the facts known to Officer Tafisi before he called Mr. Dell over give rise to a reasonable suspicion that criminal activity—specifically, car prowling—was afoot? The parties, of course, stake out opposing positions on this issue. The government argues that Officer Tafisi's brief investigatory detention of Mr. Dell was supported by reasonable suspicion because the "actions of [Mr.] Dell and his companion around the unoccupied, parked car and their reaction upon noticing Officer Tafisi were highly suspicious." Aplt. Opening Br. at 5. Mr. Dell conversely argues that the "actions taken by [Mr.] Dell and his companion prior to the investigatory stop were [] innocuous." Aplee. Br. at 14. Considering the parties' arguments, the majority concludes that what happened here was not legally sufficient to engender a reasonable suspicion of criminal conduct, and Mr. Dell's (and his companion's) actions were like that of anyone else on the street. *See, e.g.,* Maj. Op. at 12 ("But what Officer Tafisi actually saw was too tame to suggest reasonable suspicion."). However, as I explain below, this conclusion is fatally flawed because even "a series of acts, each of them perhaps innocent if viewed separately, . . . [can] warrant[] further investigation" if taken together. *United States v. Sokolow*, 490 U.S. 1, 9–10 (1989) (quoting *Terry*, 392 U.S. at 22) (internal quotation marks omitted).

-5-

## A

The Fourth Amendment protects the public from "unreasonable searches and seizures," U.S. Const. amend. IV, including unreasonable "investigatory stop[s]" or detentions, *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010). Because what happened here was clearly an investigative detention rather than a custodial arrest, the principles originally set forth in *Terry v. Ohio*, 392 U.S. 1 (1968), guide our determination as to the reasonableness of that detention. In *Terry*, the Supreme Court held that not every restriction on personal privacy or liberty that amounts to a Fourth Amendment "search" or "seizure" must be justified by the degree of particularized suspicion reflected in the probable-cause standard. *See id.* at 22, 30. Rather, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at 7 (quoting *Terry*, 392 U.S. at 30). Under the Fourth Amendment, the determination of whether an investigative detention is constitutional entails a two-step analysis: the detention "is reasonable if it is (1) 'justified at its inception' and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009) (quoting *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004)).

An investigative detention is justified at its inception if an officer has "objectively reasonable articulable suspicion that a detainee committed or is about to commit a crime."

*Lundstrom v. Romero,* 616 F.3d 1108, 1120 (10th Cir. 2010) (quoting *United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003)) (internal quotation marks omitted). In determining whether reasonable suspicion exists, we "view[] the totality of the circumstances to see whether the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing," *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (en banc) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)), "rather than assessing each factor or piece of evidence in isolation," *United States v. McGehee*, 672 F.3d 860, 867 (10th Cir. 2012); *see United States v. Guerrero*, 472 F.3d 784, 787 (10th Cir. 2007) ("The Supreme Court has instructed that we not examine each factor adding up to reasonable suspicion individually, but that we evaluate how convincingly they fit together into a cohesive, convincing picture of illegal conduct."). Thus, "[n]o one factor is determinative." *McGehee*, 672 F.3d at 867 (alteration in original) (quoting *United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc)) (internal quotation marks omitted).

When making our assessment of whether reasonable suspicion exists, "deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions," *id*. (quoting *United States v. Wood*, 106 F.3d 942, 946 (10th Cir. 1997)) (internal quotation marks omitted), and we "need not rule out the possibility of innocent conduct," *id*. (quoting *United States v. Albert*, 579 F.3d 1188, 1197 (10th Cir. 2009)) (internal quotation marks omitted). "[W]e consider the reasonableness of an officer's actions using an 'objective standard.'" *Id*. (alteration in original) (quoting

*United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009)) (internal quotation marks omitted). "Under this objective standard, we ask whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id*. (quoting *Winder*, 557 F.3d at 1134) (internal quotation marks omitted).

We may assume without deciding that Mr. Dell was detained or "seized" for Fourth Amendment purposes when Officer Tafisi told him, "Hey, come over," and he obeyed this command. *See, e.g., Salazar*, 609 F.3d at 1064 ("When an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" (alteration in original) (quoting *California v. Hodari D.*, 499 U.S. 621, 625–26 (1991))). In other words, Officer Tafisi's command, and Mr. Dell's subsequent acquiescence, gave rise to an investigative detention. Since that investigative detention would be justified only if it was lawful at its inception, we examine whether at that moment Officer Tafisi had an "objectively reasonable articulable suspicion that [Mr. Dell had] committed or [was] about to commit a crime." *Lundstrom,* 616 F.3d at 1120 (quoting *Cervine*, 347 F.3d at 869) (internal quotation marks omitted).[3]

---

[3] Only the reasonableness of the initial seizure is at issue in this appeal. Therefore, I have no occasion to assess whether Officer Tafisi's actions were "reasonably related in scope to the circumstances that first justified the interference." *Cervine*, 347 F.3d at 868 (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)) (internal quotation marks omitted).

**B**

Because Officer Tafisi was the only person who testified at the hearing on Mr. Dell's motion to suppress, his testimony represents the entire universe of facts that we have available in considering whether he ultimately had reasonable suspicion to conduct an investigative stop of Mr. Dell. The majority—tracking the district court's analysis—identifies three observations made by Officer Tafisi, which it concludes "at least arguably play into the reasonable suspicion analysis":

> (1) Mr. Dell and his companion were in what the officer thought to be a high-crime neighborhood, particularly with regard to car break-ins and drug crimes; (2) Mr. Dell and his companion were peering into the windows of a legally parked car; and (3) Mr. Dell and his companion walked away from the parked car upon seeing that the patrolling officer was headed in their direction.

Maj. Op. at 7; *see* Aplt. App. at 56. The majority's summary of the evidence, however, does not provide a comprehensive picture of the facts that Officer Tafisi faced that day. We must consider *all* of those facts in our analysis:

- **First**, Officer Tafisi was patrolling a neighborhood that he knew well (over six-and-one-half years), and he knew it to be a high-crime area. More importantly, it was a high-crime area specifically for "car prowl[s]," and he had personally been involved in investigating such crimes. Aplt. App. at 66, 100–101.

- **Second**, Officer Tafisi saw Mr. Dell leaning toward a car, a few inches away from the driver's-side window, and looking into the car in a back-and-forth manner. Mr. Dell's companion was doing the same, but opposite him on the passenger's side of the car.

- **Third**, Mr. Dell and his companion *were not* entering or exiting the vehicle or just walking by. They appeared as if "they were just standing there looking." *Id.* at 69.

- **Fourth**, after seeing Officer Tafisi, Mr. Dell then immediately turned south and walked away from Officer Tafisi's patrol car—in the same direction that Officer

Tafisi was driving.

- **Fifth**, the companion did not immediately follow Mr. Dell. Instead she "paused a little bit"—for a few seconds—before she decided to follow him. *Id.*

- **Sixth**, as Officer Tafisi passed by, Mr. Dell continued to walk south, but his companion "backtrack[ed]" toward the car, then a "few seconds" later turned back around to follow Mr. Dell. *Id.* at 70.

- **Seventh**, all of foregoing actions made by Mr. Dell and his companion were consistent, based upon Officer Tafisi's law enforcement judgment and experience, with car prowling.

With this understanding of the *entire* universe of facts, I believe Officer Tafisi had reasonable suspicion to stop Mr. Dell for investigative purposes.

## C

The Supreme Court has explicitly rejected a "divide-and-conquer" approach to the reasonable-suspicion analysis, *Arvizu*, 534 U.S. at 274; instead it has told us to determine if the relevant facts "fit together into a cohesive, convincing picture of [possibly] illegal conduct," *Guerrero*, 472 F.3d at 787. Yet, the majority's analysis smacks of exactly such an impermissible divide-and-conquer approach. That is, the majority methodically (albeit unwisely) discounts in isolation the significance of the facts available to Officer Tafisi that day. Not only is the majority's analytical framework flawed, but so are its conclusions under that framework.

### 1

In the majority's opinion, it states:

> The Glendale neighborhood's supposed high-crime status was
> given little weight by the district court. Officer Tafisi's assertions

-10-

about crime levels in Glendale were generalized and ambiguous, and he did not specify any portion of the Glendale area which had elevated crime rates. He said that Glendale had high crime rates for car break-ins, drugs, and other unspecified types of crime. And, as the district court pointed out, no statistics or testimony backed up this claim other than Officer Tafisi's comment that he had six and a half years' experience patrolling the Glendale area.

In accordance with the proper standard of review, we must view the facts in the light most favorable to the defendant, and also refrain from denigrating the trial judge's factual findings, which were made after the trial judge personally witnessed Officer Tafisi's testimony at the suppression hearing. The district court found that Officer Tafisi's beliefs about the area's crime rate were anecdotal in nature, and not particularly probative or persuasive. Deferring to that finding, we decline to attribute significant weight to the fact that this incident took place in a supposed "high crime" area.

Maj. Op. at 8–9 (footnote omitted) (citations omitted).

I respectfully submit, however, that the majority's reasoning is predicated upon a misunderstanding of the operative standard of review and our appellate role. In its headlong rush to "refrain from denigrating the trial judge's factual findings," Maj. Op. at 8; *see also id.* at 8 n.3 ("Our standard of review . . . requires us to defer to the facts as found by the district court."), the majority stumbles. Specifically, although we must construe the *facts* in the light most favorable to Mr. Dell and accept the district court's *findings of fact* unless they are clearly erroneous, we need not defer to the district court's *conclusions* regarding the *legal significance* of the facts. *Compare Ornelas v. United States*, 517 U.S. 690, 697 (1996) ("A policy of sweeping deference [to trial courts] would permit, [i]n the absence of any significant difference in the facts, the Fourth Amendment's incidence [to] tur[n] on whether different trial judges draw general

-11-

conclusions that the facts are sufficient or insufficient to constitute probable cause. Such

varied results would be inconsistent with the idea of a unitary system of law. This, if a

matter-of-course, would be unacceptable." (second, third, and fourth alteration in

original) (citation omitted) (quoting *Brinegar v. United States*, 338 U.S. 160, 171 (1949))

(internal quotation marks omitted)), *with United States v. Villegas*, 554 F.3d 894, 989

(10th Cir. 2009) ("The appearance of the hand gesture is a matter of historical fact, not

involving an analysis of Fourth Amendment law, and is peculiarly a matter best left to the

fact finder."). I do not find the majority's specific brand of deference to be part and

parcel of the operative standard of review and dictated by our appellate charge.

Even accepting for the sake of argument that the district court perceived Officer

Tafisi's testimony as the majority asserts,[4] under the circumstances present here, whether

Officer Tafisi's beliefs are "probative," or "particularly persuasive" are not factual

questions—the resolution of which by the district court would rightly be entitled to

deference. Instead, the answers to those questions involve *conclusions* about the *legal*

*significance* of the facts. *Cf. Cortez,* 478 F.3d at 1136 (en banc) (Hartz, J., concurring in

part and dissenting in part) ("Our only deference to the trial judge is in the findings of

historical fact, not the determination whether the found facts establish probable cause or

---

[4]     As best that I can discern from my reading of the district court's order, the district court *did not* expressly describe Officer Tafisi's beliefs (as the majority does) as "*not* particularly reliable or probative." Maj. Op. at 8 n.3; *see id.* at 9 (asserting that the district court opined that Officer Tafisi's "beliefs" were "anecdotal in nature, and not particularly probative or persuasive").

-12-

reasonable suspicion.").  Indeed, determining whether facts are "probative" or "particularly persuasive" ordinarily will involve the application of law to historical facts. *Cf.* Fed. R. Evid. 401 advisory committee's note ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter *properly* provable in the case." (emphasis added)).  The district court was no better situated here than we are to form such conclusions about the legal significance of the historical facts that Officer Tafisi conveyed in his testimony; consequently, the district court's conclusions are not entitled to deference.  Moreover, even if the district court's characterization of Officer Tafisi's testimony as "anecdotal" amounts to a factual finding, as discussed below, under the governing law, that finding does not avail Mr. Dell.

Significantly, the district court never suggested that Officer Tafisi was *not* a credible witness.  Of course, such a factual determination by the district judge—present in the courtroom with Officer Tafisi—would have been entitled to our deference.  *See, e.g.*, *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997) (noting that "[j]udging the credibility of the witnesses" is, *inter alia*, "within the province of the district court").  But we do not have that situation here.  Officer Tafisi's testimony stands unimpeached on credibility grounds.  And, for the reasons explicated below, I think that his testimony was quite sufficient on the question of whether Mr. Dell's investigative detention took place in a high-crime area.

To begin, I suspect that we can all agree that an individual's presence in a

high-crime neighborhood is not in itself sufficient to justify an investigative stop. *See Brown v. Texas*, 443 U.S. 47, 52 (1979) ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."); *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) (stating that a defendant's "presence in a high-crime area is not, 'standing alone,' enough to provide reasonable suspicion, but it may be a 'relevant contextual consideration' in a *Terry* analysis" (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000))); *cf. United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996) (concluding that there was no reasonable suspicion where an ex-convict with a gang affiliation refused to stop when asked by an officer to do so in a high-crime area). However, "courts have repeatedly held that such a characteristic of the location of the stop [i.e., its high-crime nature] is relevant to the analysis and may be taken into consideration." *United States v. McHugh,* 639 F.3d 1250, 1257 (10th Cir. 2011); *see, e.g.*, *Wardlo*w, 528 U.S. at 124 ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.")

Officer Tafisi testified that he had been assigned to the "Glendale area," which has "high[] crime for car prowl[s] [and] high[] crime for drugs and so forth." Aplt. App. at 66. The majority defers to the district court's "finding" that this testimony was "anecdotal in nature, and not particularly probative or persuasive," Maj. Op. at 9, and notes—as the district court did—that "no statistics or testimony backed up this claim

-14-

other than Officer Tafisi's comment that he had six and a half years' experience patrolling the Glendale area," *id.* at 8. Putting aside the analytical flaws (as discussed above) in the majority's deference-driven approach, I am not aware of any instance where our court has been so restrictive in evaluating an officer's *credible and unchallenged* testimony regarding the level of crime in a neighborhood. Not only did Officer Tafisi testify that Glendale was a high-crime area, but he went further: he indicated that it was a high-crime area for exactly the type of crime that Officer Tafisi suspected Mr. Dell of attempting to commit—a car break-in (i.e., car prowling). *See United States v. Santio*, 351 F. App'x 324, 331 (10th Cir. 2009) ("[The defendant's] behavior implicated a reasonable and articulable suspicion he was involved in the very criminal activity the officers were investigating; i.e., the stolen vehicle and [the defendant's] seemingly discernable interest in that vehicle.").

I suppose one could say that Officer Tafisi's testimony is "anecdotal" in the sense it was based on his personal observations. But that does not mean it was unreliable. Indeed, I would emphatically assert that Officer Tafisi's observations of the neighborhood he has patrolled for six-and-one-half years are *inherently reliable* and exactly the type of evidence we would want to determine the characteristics of a neighborhood. Moreover, a lack of statistics to corroborate his testimony is immaterial. I know of no court (including our own) that has required the government to produce crime statistics in order to buttress an officer's observations, at least when those observations (as here) are credible and *otherwise have indicia of reliability. See, e.g., United States v. Baskin*, 401 F.3d 788, 793

-15-

(7th Cir. 2005) (rejecting petitioner's argument that "the government must produce 'specific data' establishing that a location is a 'high-crime area'" to support reasonable suspicion).

The majority implies that because Officer Tafisi only testified that Glendale is a high-crime area—rather than testifying that the specific street in Glendale where Mr. Dell was found had elevated crime rates—we should not give his testimony significant weight when viewing the evidence in a light most favorable to Mr. Dell. *See* Maj. Op. at 8 ("Officer Tafisi's assertions about crime levels in Glendale were generalized and ambiguous, and he did not specify any portion of the Glendale area which had elevated crime rates. "). However, the majority offers no Tenth Circuit authority that would support such a heightened, particularized showing. And I am not aware of any. In setting forth the relevant, salient facts in suppression cases, we have frequently referred to the high-crime nature of *neighborhoods*. *See, e.g.*, *United States v. Neff*, 300 F.3d 1217, 1219 (10th Cir. 2002) ("The neighborhood was known as a high crime area where many children live and play."); *United States v. Soto-Cervantes*, 138 F.3d 1319, 1324 (10th Cir. 1998) (noting that "[a] neighborhood's reputation for housing illegal immigrants . . . is a relevant factor to be considered" in the reasonable-suspicion analysis (citation omitted)); *United States v. Harris*, 995 F.2d 1004, 1005 (10th Cir. 1993) (noting that "defendant parked his car in front of a fire hydrant in a high-crime residential neighborhood in Denver, Colorado."). In the absence of supportive case law in our circuit, and given that our cases at least arguably indicate a contrary view regarding whether the description of a

-16-

high-crime area has to be more specific than the identification of a neighborhood, I respectfully submit that the majority's reasoning that suggests the need for heightened specificity is flawed. I conclude that Officer Tafisi's credible and unchallenged testimony was sufficiently specific as to the location to indicate that the area of Mr. Dell's investigative detention was a high-crime area.

2

The majority also takes issue with the significance of Officer Tafisi's initial observation—*viz.*, the sight of Mr. Dell and his companion on either side of the car, leaning within inches of it, while peering back-and-forth inside. "[T]roubling" to the majority "is the absence of any illegal conduct by Mr. Dell (or his companion)" and, in its estimation, the fact that "[t]he conduct observed by Officer Tafisi was so innocuous and so very much in the realm of ordinary behavior that it would not lead a reasonable officer to suspect that a car break-in had occurred or was about to occur." Maj. Op. at 11–12. I disagree.

Let us take a closer look at the facts. We know that Officer Tafisi was patrolling in an area prone to car break-ins, and he observed two people on either side of a car peering inside. This is conduct that, based upon his law enforcement experience and judgment, Officer Tafisi believed to be consistent with car prowling. We may properly credit that experience and judgment. *See Arvizu*, 534 U.S. at 273 (suggesting that an officer may "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well

-17-

elude an untrained person" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)) (internal quotation marks omitted)). And, on these facts, it clearly is reasonable to do so.

To be sure, there are innocent reasons why two people might be on either side of a car peering inside it. The most obvious—and I would argue most likely— would be that the individuals were entering or exiting the car and for some reason needed to look inside. However, according to Officer Tafisi, Mr. Dell and his companion were not entering or exiting the vehicle—they appeared as if "they were just standing there looking." And there is nothing in the record to suggest that Officer Tafisi's testimony should be discounted or discredited.

Once the possibility that Mr. Dell and his companion were getting in or out of the car is reduced significantly, *their actions at that moment become much more suspicious*. In other words, if they are not coming or going from the car itself, it is much *less* likely that two people would stand on either side of a vehicle, peering in, for any innocent, non-criminal purpose. *See* 4 Wayne R. LaFave, *Search & Seizure* § 9.5(d), at 496 (4th ed. 2004) ("[T]he act of repeatedly looking into parked cars suggests that the person is about either for the purpose of stealing from a vehicle or for the purpose of taking a car having the ignition keys in it, and thus it will take little else to justify a stop. "); *cf. United States v. Douglas*, 964 F.2d 738, 740 (8th Cir. 1992) ("[The] [o]fficer . . . observed appellant exiting the back seat of a vehicle; appellant did not enter one of the apartment buildings; [the officer's] experience patrolling the apartment complex led him to believe that appellant's activities were not consistent with that of a resident or visitor; [the officer]

-18-

knew that auto break-ins had occurred in [that] area; and appellant provided an untenable explanation for his contact with the vehicle."). More specifically, once the possibility was reduced significantly that Mr. Dell and his companion were getting in or out of the car, under the totality of the circumstances, a reasonable officer could have well concluded that there was a very real possibility that they were engaged in car prowling. In sum, given the suspicious nature of what Mr. Dell and his companion were doing and the reality that we need not conclusively rule out all innocent possibilities, *see McGehee*, 672 F.3d at 867, unlike the majority, I would not be inclined to describe what Officer Tafisi observed the pair doing as innocuous and, instead, believe that it (viewed along with all the factual circumstances) established the foundation for reasonable suspicion.

**3**

Finally, the majority also downplays the significance of what happened after Mr. Dell became aware of Officer Tafisi's presence. It states that "Mr. Dell's walking away upon seeing a police officer tells us very little about the likelihood of criminal activity taking place." Maj. Op. at 9. As I explain, Mr. Dell's reaction in walking away—coupled with his companion's repeated bouts of hesitancy about what to do next, i.e., furtive behavior—was the stuff of reasonable suspicion.

It is uncontested that when Mr. Dell saw Officer Tafisi he immediately disengaged from looking into the car and began walking away. I freely acknowledge that this conduct does not amount to the "unprovoked [or headlong] flight upon noticing the police" that the Supreme Court concluded in *Wardlow* was the "the consummate act of

-19-

evasion" that provided the basis for reasonable suspicion that the defendant was "involved in criminal activity"—when coupled with the fact that the flight occurred in a "high crime area." 528 U.S. at 124–25; *see Davis*, 94 F.3d at 1468 ("[The defendant's] actions in exiting the car, making and then breaking eye contact with the officers, and then walking away from the officers also do not furnish the basis for a valid *Terry* stop."); *see also Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005) ("[The] simple act of walking away from the officers could not have been reasonably mistaken for the type of 'flight' the officers confronted in *Wardlow*."); *cf. Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (plurality) ("The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.").

However, we must evaluate Mr. Dell's act of walking away in conjunction with the reaction of his companion because flight is not the only type of "nervous, evasive behavior" that exists. Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions. *See, e.g., McGehee*, 672 F.3d at 870 (holding that furtive actions may contribute to probable cause); *DeJear*, 552 F.3d at 1201 ("Furtive movements, nervousness, and the fact that conduct occurs in an area known for criminal activity are all appropriate factors to consider in determining whether reasonable suspicion exists."); *Johnson*, 364 F.3d at 1192 ("[N]ervousness, *even if it may be a normal reaction*, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded." (emphasis added)); *United States v. Edmonds*, 240 F.3d 55, 61 (D.C. Cir.

-20-

2001) (holding that a suspect's act of reaching under the driver's seat in response to a police presence can be factored into a reasonable-suspicion analysis as a "furtive" gesture); *see also United States v. Brown*, 334 F.3d 1161, 1167–68 (D.C. Cir. 2003) (characterizing the act of a car passenger of jumping from the back-seat to the front-seat upon seeing the police as "furtive").

The furtive conduct of Mr. Dell's companion included repeated bouts of hesitancy about walking in lockstep with Mr. Dell down the street. More specifically, when Mr. Dell began to immediately walk down the street upon seeing Officer Tafisi, in the same direction the officer was driving, his companion did not do the same. Instead she paused for a "few seconds" before she decided to follow Mr. Dell. Aplt. App. at 69. Shortly thereafter, Officer Tafisi passed by the pair in his squad car, and he could see Mr. Dell and the companion in his rearview mirror. While Mr. Dell continued to walk in the same direction the patrol car had traveled, his companion *again did not act in concert with him*, instead she "backtrack[ed]" toward the car, then a "few seconds" later turned back around to follow Mr. Dell. *Id*. at 70.

There may be many ways to explain this behavior. However, as I have noted, a reasonable officer need not exclude every innocent explanation for an individual's conduct. Therefore, the majority's suggestion that "[t]he companion's conduct was . . . even more exculpatory than Mr. Dell's own conduct," Maj. Op. at 10 n.4, does not take us far in the analysis. *See United States v. Santos*, 403 F.3d 1120, 1125 (10th Cir. 2005) ("[T]he Supreme Court has unanimously reversed courts of appeals for overturning

-21-

district court decisions denying motions to suppress, even when every single factor identified by the officers involved as suspicious was either innocuous or susceptible of an innocent explanation."). The question is not whether there was a lawful explanation for the companion's conduct, but rather whether under the totality of the circumstances a reasonable officer could have viewed that conduct as furtive and suggestive of criminal activity. I answer that question in the affirmative. The companion was with Mr. Dell when they were looking into the windows of the vehicle. When Mr. Dell walked away from the vehicle upon seeing Officer Tafisi's patrol car, it would have been a quite natural reaction for the companion to follow him. But, yet, she did not. More specifically, she appeared to be unable to make up her mind about whether to do so. She vacillated— walking with Mr. Dell in the direction that Officer Tafisi was driving, and then backtracking *away* from the direction he was driving. Considering all of the factual circumstances, a reasonable officer could have concluded that the somewhat unusual conduct of Mr. Dell's companion was furtive and suggestive of criminal wrongdoing.

Generally speaking, given the presence of objective indicators of criminal conduct, a reasonable officer could permissibly take action to investigate—not only to confirm but also to *dispel*—the suspicion that criminal conduct was afoot. *See, e.g., Johnson*, 364 F.3d at 1195 (noting that the officer "acted just as society would want its law enforcement officers to act when investigating a suspicious situation," in that he did not do "any more than was necessary to negate or, as it turned out, confirm his suspicions"); *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir. 1993) ("Officers may ask the detained individual

questions during the *Terry* stop in order to dispel or confirm their suspicions . . . .").; *accord United States v. Hughes*, 517 F.3d 1013, 1016 (8th Cir. 2008) ("Where a police officer has reasonable suspicion that criminal activity may be afoot, the officer may briefly stop an individual and make reasonable inquiries aimed at confirming or dispelling the suspicion."). I consider the totality of the circumstances—including notably Mr. Dell's reaction in walking away upon seeing Officer Tafisi and his companion's furtive reactions—as evincing sufficiently particularized and objective indicia of possible criminal conduct, that a reasonable officer, in Officer Tafisi's position, would have been authorized to conduct a detention to investigate. *See United States v. Mireles*, 583 F.2d 1115, 1117 (10th Cir. 1978) ("[E]ven though a police officer may not have probable cause to make an arrest, he may nonetheless in appropriate circumstances and in an appropriate manner approach a person for the purpose of investigating possible criminal behavior."); *cf.* 4 LaFave, *supra* § 9.5(f), at 528 (explaining that a stronger case for reasonable suspicion can be made where it is likely that a defendant's reaction in leaving upon seeing the police was "causal" rather than "coincidental" (emphases omitted)). In short, from the perspective of a reasonable officer who is on patrol in a neighborhood that is prone to car break-ins, it would have been eminently reasonable to wonder whether some criminal activity was afoot based on what Officer Tafisi saw. *See Arvizu*, 534 U.S. at 273.

### III

For the foregoing reasons, I would hold that the district court erred in granting Mr. Dell's suppression motion and reverse the court's order. I would remand the case for further proceedings. Because my esteemed colleagues in the majority reach the obverse conclusion on these matters, I must respectfully dissent.